# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | |
|---|---|
| **HAMILTON HALL SWART,** ) | |
| ) | |
| Plaintiff, ) | Case No. 7:14CV00652 |
| ) | |
| v. ) | **OPINION** |
| ) | |
| **HAROLD W. CLARKE, ET AL.,** ) | By: James P. Jones |
| ) | United States District Judge |
| Defendants. ) | |

*Hamilton Hall Swart, Pro Se Plaintiff; Carlene Booth Johnson, Perry Law Firm, Dillwyn, Virginia, for Defendant Dixon; Nancy Hull Davidson, Office of the Attorney General of Virginia, Richmond, Virginia, for Remaining Defendants.*

Hamilton Hall Swart, a Virginia inmate proceeding pro se, filed this civil rights action under 42 U.S.C. § 1983. Liberally construed, Swart's Complaint alleges that the defendant prison administrators acted with deliberate indifference to his serious medical needs, in violation of his rights under the Eighth Amendment. After review of the record, I conclude that the defendants' dispositive motions must be granted.

I.

Swart's claims arise from his course of medical treatment for an injured shoulder at Buckingham Correctional Center ("BKCC").[1] On February 3, 2013, BKCC medical staff examined Swart for complaints that he had injured his left

---
[1] All parties rely on the same medical records that are largely undisputed.

shoulder while weight lifting. Staff members provided him with an arm sling and scheduled him to see the institutional physician the next day.

After examining Swart's injured shoulder on February 4, 2013, the doctor prescribed pain medication and ordered an X ray. The X ray, performed on February 8, showed "no fracture or dislocation of the shoulder," with some "mild to moderate degenerative changes within the joint space." (Sargent Aff. ¶ 7, ECF No. 29-1.) BKCC medical staff saw Swart on February 12 and 28, and March 13, 2013, for complaints of shoulder pain. The BKCC physician examined Swart on March 14, 2013, about his shoulder problems and ordered an MRI (magnetic resonance imaging) of the left shoulder. Medical records indicate that staff prepared and sent preregistration paperwork for Swart to receive an MRI in early March, even before the doctor issued the order.

In the following months, BKCC medical staff placed multiple requests (in March, May, July, August,[2] and twice in September 2013) to the Medical College of Virginia ("MCV"), via telephone, fax, and email, to have Swart scheduled for an MRI at MCV. In response to these requests, staff at MCV failed to schedule,

---

[2] According to Swart, after being transported to MCV on May 24, 2013, for what he thought would be an MRI of his shoulder, he was notified that the order was for an MRI of his knee instead. Swart had complained of knee pain before his first complaint of shoulder pain; the MRI showed a mild collateral ligament sprain of the knee. A medical note on August 29, 2013, indicated that Swart expressed anger to staff about the delay of the shoulder MRI and frustration at having believed it would happen on May 24, only to be disappointed by getting an MRI of his knee instead. He continued to complain of shoulder pain.

postponed, or cancelled appointments for Swart to undergo the requested MRI of his shoulder. Ultimately, because of these delays, on October 23, 2013, Nurse Dixon at BKCC arranged for Swart to be sent to Southside Community Hospital ("SCH") for an MRI. Records reflect that Swart underwent an MRI of his left shoulder at SCH on October 29, 2013.

The results of the October 2013 MRI revealed "moderate degenerative joint disease; a complete tear through the supraspinantus tendon retraction of 3-4cm; the infraspinatus intact; the teres minor intact; the subscapularis intact." (*Id.* at ¶ 14.) The MRI also revealed a small tear within the "superior aspect of the labrum" and "moderate AC joint arthritis," but "demonstrated no fractures subluxation or osseous lesions." (*Id.*)

A physician at MCV examined Swart on November 8, 2013, as a followup to the MRI performed at SCH. The MCV physician noted from his review of the MRI report that Swart had "a complete supraspinatus tear with tendon retraction, moderate ac joint arthritis and glenohumeral DJD in the labrel tear." (*Id.* at ¶ 15.) The doctor noted that Swart should work on his rotator cuff exercises with the physical therapist and wanted a follow-up exam to determine how much external rotation and abduction weakness Swart had. The doctor also noted evidence of subluxation of the shoulder, such that it might be worthwhile to do a rotator cuff

repair, and noted his intention to see Swart again in two weeks, to review the MRI itself and make an operative decision.

On November 12, BKCC medical staff requested scheduling of the follow-up and pre-surgery appointment noted by the MCV physician from Swart's November 8 exam. The BKCC physician also ordered that Swart's MRI and X rays be sent with him to his next MCV appointment. BKCC staff made a second request on November 21 to schedule the follow-up exam for Swart at MCV. On December 4, 2013, BKCC staff scheduled Swart for an MCV consult, to take place on December 30, 2013. A staff note by Nurse Dixon on January 3, 2014, indicates that the December consult had to be cancelled the night before, due to a staffing shortage at BKCC. On January 6, 2014, BKCC medical staff made a request for rescheduling of Swart's consult at MCV, and the new date was set for January 27.

The MCV physician who examined Swart on January 27, 2014, asked to review his MRI results to discuss possible surgery options, as recommended by the physician in his notes from the November 8 exam. Swart told the physician that he had undergone an MRI at a local hospital, but could not remember the facility's name. The doctor noted that Swart became upset, believing that BKCC staff had not sent the MRI results to the exam with him, as ordered. The doctor then noted that he wanted to follow-up with Swart in one month and asked that Swart's MRI imaging be provided for review on a CD or be uploaded to MCV's system for

evaluation. On January 29, 2014, BKCC asked SCH staff to forward a second disk of Swart's left shoulder MRI results to MCV.

At Swart's February 24 follow-up exam at MCV, the attending physician found that Swart had a "glenohumeral tear." (*Id.* at ¶ 24.) He gave Swart "a C5 injection" in the injured shoulder and asked that a follow-up visit be scheduled in six months. (*Id.*) That follow-up consult was scheduled for August 25, 2014.

Swart was seen by BKCC staff on March 11, 2014, for complaints of knee and shoulder pain. Staff noted that Swart asked if surgery was going to be approved. A BKCC physician examined Swart on March 17 for knee and shoulder pain, and prescribed pain medication for him. BKCC staff contacted the MCV physician on March 26, and again on March 31, 2014, asking about future treatment plans for Swart's shoulder. On April 4, the MCV physician's assistant contacted BKCC medical staff to inform them that Swart's MCV follow-up appointment had been moved up from August 25 to April 21, 2014, when Swart would have new X rays taken to discuss surgery options.

At the April 21 exam at MCV, the physician noted that Swart had a partial cuff tear to his left shoulder. The doctor noted that Swart was young for shoulder replacement surgery and that his arthritis was not bad. The doctor then recommended that Swart avoid heavy lifting and practice cuff strengthening. He

also prescribed pain medication for Swart and requested a follow-up appointment in four months, which was scheduled for August 11, 2014.

The MCV physician who examined Swart on August 11 noted that Swart had "a massive rotary cuff tear" and had had "a 4cm retracted tear two years [earlier]," as shown on the 2013 MRI. (*Id.* at ¶ 30.) The doctor ordered a second MRI to "determine if repair was still necessary" and if "degenerative changes" in Swart's shoulder had advanced. (*Id.*) The doctor noted his intention that Swart be scheduled for a follow-up consult after the MRI — to review the new MRI results and other films and "make a determination from that point if surgery was still an option." (*Id.*)

The BKCC physician ordered on September 5, 2014, that Swart was to be scheduled for an MRI at MCV, and staff sent a request to MCV that same day. On September 5, MCV scheduled Swart for an MRI on October 2. That appointment was later rescheduled to October 9, 2014. Swart saw an MCV physician on December 29, 2014, to discuss the MRI findings and possible surgery. The MCV physician recommended surgery on Swart's left shoulder, which was performed as scheduled on January 26, 2015, at MCV.

Swart filed this § 1983 action in December 2014 against several Virginia Department of Corrections ("VDOC") officials: Harold W. Clarke, Director; A. David Robinson, Chief of Operations; Frederick Schilling, Director of Health

Services; Earl R. Barksdale, BKCC Warden; Clint Davis, BKCC Assistant Warden; and Lou Dixon, BKCC Head Nurse Manager.  Swart alleges that these defendants — personally and through their "policies, practices, acts and/or omissions" — have acted with "deliberate indifference to [his] serious medical and health care needs"; "placed or will place [Swart] at an unreasonable risk of suffering new or worsening serious medical illnesses, injuries and harm"; and "have injured Swart due to the provision of inadequate medical care and/or negligence."  (Compl. ¶¶ 51, 52, 54, ECF No. 1.)  As relief in this lawsuit, Swart seeks declaratory and injunctive relief regarding his medical care in the future, as well as punitive damages.

Nurse Dixon has filed a Motion to Dismiss, and the other VDOC administrators have filed a Motion for Summary Judgment.  Swart has responded to both motions, making the matter ripe for disposition.[3]  Swart attaches to his response his own affidavit, reporting that at his April 21, 2014, MCV appointment, the doctor told Swart that his shoulder was "really messed up" and that he would "need a shoulder replacement."  (Swart Aff. Ex. 4 ¶ 3, ECF No. 32-1.)  According to Swart, the doctor also said that he did not "think they're going to do it right now

---

[3] In his Response, Swart states for the first time that with discovery, he might find some unspecified documentation to support his vague assertions that the administrative defendants are at fault for delaying proper care for his shoulder.  The record reflects, however, that Swart has had ample opportunity to engage in discovery, and he offers no reason for his apparent failure to do so.  Therefore, I find no basis for delaying disposition of the defendants' motions.

-7-

because the prison waited too long to get [Swart] a specialist." (*Id.* at ¶ 4.) Swart also states that at his December 29, 2014, MCV appointment, the doctor told him, "Buckingham waited too long before addressing the problem of [your] shoulder issue, which is why [your] shoulder is in the condition it is in" and in need of surgery. (Swart Aff. Ex. 2 ¶ 5, ECF No. 32-1.)

II.

A. The Constitutional Standard.

Section 1983 permits an aggrieved party to file a civil action against a person for actions taken under color of state law that violated his constitutional rights. *See Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013). An Eighth Amendment claim regarding medical care requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

Objectively, the medical condition at issue must be "serious." *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (finding no expectation that prisoners will be provided with "unqualified access to health care"). Even if I were to assume that Swart's shoulder issues presented a serious medical need for treatment at BKCC, to prevail on his § 1983 claim, he must also show the defendants' "deliberate

-8-

Case 7:14-cv-00652-JPJ-RSB   Document 38   Filed 02/01/16   Page 8 of 17   Pageid#: 300

indifference" to that need, in essence, their "subjective recklessness" in the face of his serious medical condition. *See Farmer*, 511 U.S. at 839-40. Specifically, he must state facts indicating that each defendant knew of and disregarded an excessive risk to his health or safety. *Id.* at 837.

"[A]n inadvertent failure to provide adequate medical care" does not amount to deliberate indifference. *Estelle*, 429 U.S. at 105. Similarly, the "deliberate indifference standard is not satisfied by . . . mere disagreement concerning [q]uestions of medical judgment." *Germain v. Shearin*, 531 F. App'x 392, 395 (4th Cir. 2013) (unpublished) (internal quotation marks and citations omitted) (holding that question of medical judgment that is not subject to judicial review in § 1983 action); *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (holding disagreements between inmate and physician over proper medical care do not generally state § 1983 claim).

### B. Nurse Dixon's Motion to Dismiss.

Swart alleges that Nurse Dixon was responsible "for medical decisions to include scheduling and follow-ups with both in-house and outside medical referrals for treatment by specialists" and for "scheduling surgery after approval from" administrative officials. (Compl. ¶¶ 12, 14, ECF No. 1.) He faults her for the cancellations and rescheduled appointments that delayed his MRI for nine months in 2013 and asserts that these delays "exceed[ed] the parameters of 'ordinary lack

-9-

Case 7:14-cv-00652-JPJ-RSB   Document 38   Filed 02/01/16   Page 9 of 17   Pageid#: 301

of due care" and prevented him from receiving "proper care." (Pl.'s Resp. 4, ECF No. 35.)

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a complaint to determine whether the pleader has properly stated a plausible claim for relief. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). When addressing such a motion, the court accepts as true all well-pled *facts* and draws "all reasonable factual inferences from those facts in the plaintiff's favor." *Id*. at 244. However, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007)). "A claim has facial plausibility" and survives a 12(b)(6) motion only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Taking Swart's allegations and the undisputed portions of the medical records on which Swart relies in the light most favorable to him, I conclude that he has not pleaded facts showing Nurse Dixon's deliberate indifference to his serious medical needs. The medical records indicate that while under her supervision at BKCC, Swart has received extensive medical evaluation and treatment by the

-10-

Case 7:14-cv-00652-JPJ-RSB   Document 38   Filed 02/01/16   Page 10 of 17   Pageid#: 302

prison's medical staff, as well as outside specialists. While he obviously desired to learn sooner the diagnosis and treatment the specialist would recommend after reviewing the MRI results, Swart had no constitutional right to receive the MRI within his preferred timeline. Nothing in his allegations or submissions indicates that Nurse Dixon received any directive from Swart's treating physician at BKCC that delays of the MRI procedure would aggravate Swart's condition in any way or that the MRI should be scheduled elsewhere if it could not be conducted within a specific time period at MCV. Indeed, even after the MRI was conducted in Octoer 2013, the MCV specialist did not deem Swart's shoulder condition to require immediate surgery or any other acute care. In short, Swart simply states no facts showing that Nurse Dixon knew at any time that treatment being provided to Swart or its timing placed Swart at any significant risk of serious harm related to his shoulder condition.

Rather, Swart's claims against Nurse Dixon are disagreements with her decisions to reschedule the MRI at MCV, instead of determining sooner to schedule the procedure at another facility. Such disagreements with medical judgments are essentially allegations of medical negligence, which do not

implicate any constitutional right and, therefore, are not actionable under § 1983.[4] *See Estelle*, 429 U.S. at 105-06. Therefore, I conclude that Swart has failed to state any plausible § 1983 claim against Nurse Dixon and will grant her Motion to Dismiss accordingly.

D. The Administrators' Motion for Summary Judgment.

Swart alleges, broadly, that the BKCC medical system and staff for which the administrative defendants are responsible did not provide him with adequate medical care on a timeline that he believed appropriate for his shoulder pain. On this basis, he seeks to hold these defendants liable under § 1983 for the two-year delay he experienced before undergoing shoulder surgery. He vaguely asserts that such "deviations from the accepted and appropriate standard of care on the bases of cost," or because of "ineptitude and/or carelessness," resulted in his prolonged shoulder pain. (Compl. ¶ 44.)

To survive the defendants' Motion for Summary Judgment, Swart must present specific and disputed facts from which a jury could reasonably find in his favor on each of his claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-

---

[4] In addition to his constitutional claims, Swart's Complaint may be attempting to raise claims of medical negligence or malpractice. Section 1983 was intended to protect only federal rights guaranteed by federal law, however. *Wright*, 766 F.2d at 849. Any claim of medical negligence or even malpractice under state law is thus not independently actionable under § 1983, and I decline to exercise supplemental jurisdiction over such claims in this action. *See* 28 U.S.C. § 1367(c). Therefore, I will dismiss all state law claims without prejudice.

-12-

57 (1986). Specifically, he must "plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution" and state facts to support his assertions. *See Iqbal*, 556 U.S. at 676. He cannot defeat the defendants' motion with mere groundless generalizations or speculation. *Glover v. Oppleman*, 178 F. Supp. 2d 622, 631 (W.D. Va. 2001) ("Mere speculation by the non-movant cannot create a genuine issue of material fact.").

Swart has not affirmatively pleaded how any of the administrative defendants was personally involved in the alleged violations of his constitutional rights regarding his medical care. Rather, Swart seeks to build his claims against the administrative defendants on vague generalizations and labels, unsupported by any factual matter, documentation, or affidavit evidence. For example, he alleges that one or more of the administrators may have controlled the timing and location of his MRI procedure, based on costs. As Swart states no factual matter in support, however, I need not credit these broad assertions as true. *Iqbal*, 556 U.S. at 678. Moreover, these speculative statements cannot suffice to create a genuine issue of material fact so as to preclude summary judgment as to any claim that these defendants' actions personally affected the timing of Swart's medical appointments or procedures.

Swart also cannot hold these defendants vicariously liable under § 1983 for alleged constitutional violations by their subordinates. *See Shaw v. Stroud*, 13

F.3d 791, 798 (4th Cir. 1994). Rather, to bring a claim for supervisory liability, he must plead facts showing that the "supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury" to the plaintiff, "the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices," and "there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Randall v. Prince George's Cty., Md.*, 302 F.3d 188, 206 (4th Cir. 2002) (internal quotation marks and citation omitted).

Swart fails to state facts making any of these showings. As discussed, he has not demonstrated that any medical officer acted with deliberate indifference to his serious medical needs in violation of his constitutional rights. On the contrary, the undisputed aspects of the medical records reflect that he received extensive medical evaluation, diagnostic testing, and treatment for his shoulder pain, first from the BKCC medical staff and then from the specialists at MCV.

Moreover, even if Swart could show that his treatment was deficient in some way, he forecasts no evidence on which he could prove that any of the defendant administrators *knew* the course of medical care provided to him placed him at an "unreasonable risk of constitutional injury." *Id.* (internal quotation

marks and citation omitted). Swart apparently attempts to prove that the administrators knew from receipt of his grievances and appeals that his MRI and surgery had been delayed.[5] It is undisputed, however, that these defendants are not physicians. As such, they are entitled to rely on the medical judgment and expertise of the medical professionals charged with Swart's treatment, as to whether the medical care actually provided and its timing was appropriate to meet his medical needs. *See Shakka v. Smith*, 71 F.3d 162, 167 (4th Cir. 1995). It is not the function of these prison administrators, or the court, to second guess the good faith treatment decisions of licensed physicians. *Id.*; *Russell*, 528 F.2d at 319. The administrators themselves "cannot be liable for the medical staff's diagnostic decisions" and, indeed, "cannot substitute their judgment for a medical professional's prescription." *Meloy v. Bachmeier*, 302 F.3d 845, 849 (8th Cir. 2002).

The copies of documents in the record from Swart's administrative remedy proceedings reflect that in response to Swart's remedy forms and appeals, the administrators investigated whether Swart was being evaluated and treated by licensed physicians and whether arrangements were being made to provide the treatment those physicians recommended. Other than this administrative oversight,

---

[5] It is well established that an administrator's written response to a grievance or appeal does not, independently, implicate the inmate's constitutionally protected rights, because the inmate has no constitutional right to a prison grievance procedure in the first place. *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994).

these defendants could rightfully rely on the treating physicians and the medical staff to make medically appropriate decisions about treatment and scheduling. *Shakka*, 71 F.3d at 167.

Swart does not show that any of these defendants received information from his treating physician at MCV concerning any medical necessity that the MRI or surgery needed to be conducted within a specific time period to avoid aggravating Swart's condition. In short, Swart simply has not stated facts on which he could persuade a reasonable fact finder that any of the administrators he has named as defendants knew that his course of treatment presented a significant risk of harm or that they responded unreasonably to any risks by continuing to rely on the BKCC medical staff, with recommendations from the MCV specialists, to monitor his condition, and to schedule and provide medically necessary treatment. Therefore, I conclude that in this case,[6] Swart presents no triable issue of fact that these defendants were deliberately indifferent as required to state an Eighth Amendment claim.

---

[6] Swart raises new allegations in his response to the defendants' motion, concerning treatment he received at BKCC after his shoulder surgery. He has not moved to amend his complaint to include these new allegations, and does not allege that any of these defendants had personal involvement in providing that treatment. Therefore, these new allegations cannot be considered properly as part of this action.

III.

For the reasons stated, I will grant the defendants' Motion to Dismiss and Motion for Summary Judgment as to Swart's § 1983 claims and dismiss any related state law claims without prejudice under 28 U.S.C. § 1367(c).[7]

A separate Order will be entered herewith.

DATED: February 1, 2016

/s/ James P. Jones
United States District Judge

---

[7] After submitting his response to the Motion for Summary Judgment, Swart filed a "Motion to Stay Transfer" (ECF No. 33), seeking a court order prohibiting his transfer to another prison facility during the pendency of this action. I will dismiss this motion as moot.